## SCHULTZ v. SCHULTZ.
(No. 1805; July 5, 1933; 23 Pac. (2d) 351).

The cause was submitted for the appellant on the brief of *Raymond & Diefenderfer* of Newcastle.

The cause was submitted for respondent on the brief of Preston T. McAvoy of Newcastle.

RINER, Justice.

The respondent, as plaintiff in the District Court of Weston County, brought suit for a divorce from the appellant as defendant, and obtained a decree in her favor. This proceeding, by direct appeal, is brought to review the record made and the decree thus rendered.

So far as can be gathered from the allegations of plaintiff's petition which are somewhat voluminous, the statutory (Sec. 35-108, R. S. 1931) grounds relied upon by her to obtain the relief she sought are (1) that the defendant has been guilty of extreme cruelty toward the plaintiff and (2) that he has offered such indignities to her as to render her condition intolerable. The specific acts pleaded to establish these grounds are, briefly, the excessive and abusive use by the defendant of sexual relations with his wife, that he had used obscene language to plaintiff, that he has abused and upbraided her, and that he

advertised in the local newspapers that he would not be responsible for any debts incurred by her as his wife, thereby implying that she was a spendthrift.

The proof is that the parties were married December 16, 1924, and there are no children of the marriage. The decree in question was entered on the 19th day of September, 1932. The only evidence submitted to establish the statutory ground of divorce above mentioned seems to be: The answer of the plaintiff on the request of her counsel "Tell the court why you didn't get along,"—"We couldn't get along because he said I never did anything to help him and we couldn't get along because he was too sexually minded, and that was the case, I guess." She testified, also, on cross-examination, that the situation between herself and her husband had reached the point of incompatibility, rendering it quite impossible for the parties to live together any more and that to continue the marriage relationship would be very bad for both. There appears to have been no proof at all of obscene or abusive language used by the husband toward the wife. It was established that, some three weeks before the petition in the case was filed and after the parties had separated, the defendant put a notice for one issue in a local newspaper, stating, in effect, that in the future he would not be responsible for debts contracted by her. She testifies that this action on his part caused her to feel badly. It was also proven that the husband, after the divorce action had been commenced, had served a notice upon some neighbors warning them not to trespass upon lands owned by him where she was living, her testimony being that they came to help her, although they were not friendly towards him. Considerable proof was furnished relative to hardships borne by the wife, such as frequently result from farm or ranch life, where the parties have very little of this world's

goods, and where both have been afflicted with ill health.

In our judgment, the evidence submitted is wholly insufficient to authorize the court to decree a divorce of the parties. Public policy requires that there be no severance of the marital relations without adequate cause and satisfactory proof thereof. Mere general statements of misbehavior or conclusions of the parties will not suffice. The court must be placed in possession of the facts of the case, and these facts must fairly establish a statutory ground of divorce, in order to invoke the great judicial power to rend asunder the family relation,—a relation on which civilized society so greatly relies for its support.

In Bonham v. Bonham, 25 Wyo. 449, 172 P. 333, 335, this court, applying the principle 'that any unjustifiable conduct which so grievously wounds the mental feelings of husband or wife, or utterly destroys his or her peace of mind, as to seriously endanger life or impair bodily health, or which utterly destroys the legitimate ends and objects of matrimony, constitutes cruelty, although no physical or personal violence may be inflicted or even threatened, or reasonably apprehended," held "that mere austerity of temper, petulance of manner, rudeness of language, a want of civil attention, even occasional sallies of passion, if they do not threaten bodily harm, do not constitute cruelty."

12 R. C. L. 253, § 12, states that:

"When an attempt is made through the courts to undo a marriage, the state becomes in a sense a party to the proceedings, not necessarily to oppose but to make sure that the attempt will not prevail without sufficient and lawful cause shown by the real facts of the case, nor unless those conditions are found to exist at the time the decree is made on which the state permits a divorce to be granted."

Also, on page 337, section 116, of the same text, it is pertinently said:

"Married persons must submit to the ordinary consequences of human infirmities and of unwise mating, and the misconduct which will be ground for a divorce as constituting cruelty must be serious."

So. 19 C. J. 20, § 18, declares:

"It is conceded in all jurisdictions that public policy, good morals, and the interests of society require that the marriage relation should be surrounded with every safeguard and its severance allowed only in the manner prescribed and for the causes specified by law."

In this connection, we may well recall the language of the Supreme Court of the United States in Maynard v. Hill, 125 U. S. 190, 31 L. Ed. 654, 8 S. Ct. 723:

"The consent of the parties is of course essential to its existence; but when the contract to marry is executed by the marriage, a relation between the parties is created which they cannot change. Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities. It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress."

Mr. Justice Brewer well said, in Smith v. Smith, 22 Kan. 699, 703, "as a rule, haste in divorces is not wise. Courts should not be eager to advance or grant them. They should discourage rather than encourage them. Marriage is a contract, and a relation which, if possible, should endure, and public policy requires that there be no straining of law or facts to end the con-

tract and sever the relation." That the foregoing are not outworn views of the law, the language of the Court of Appeals of Maryland, in the comparatively recent case of Gellar v. Gellar, 159 Md. 236, 150 A. 717, 719, affords appropriate proof:

"It was said by Judge Bartol, in Levering v. Levering, 16 Md. 213, decided in 1860, that 'there is no more painful and delicate duty devolved on a court of justice, than that of pronouncing upon the causes which justify a severance of the marriage relation. Public policy and public morals, alike, require that a relation so intimate and tender should not be broken for slight or trivial causes, and impose on us the duty of carefully weighing and considering the grounds upon which we are called on to affirm a decree dissolving the bonds of matrimony, between parties who respectively claim and resist the exercise of the power conferred on us by law.'

"The responsibility, delicacy and difficulty of that duty has been enlarged rather than diminished since that pronouncement. This may with truth be said to be due in part to the present day attitude of the public towards divorced persons. Formerly the state of the public mind was such that the offending spouse in a divorce proceeding was the subject of social ostracism, and even the innocent one was under suspicion of not having fully lived up to the promise made in the marriage ceremony. While this indifference, or what might be termed liberal attitude, on the part of the public now prevails, the law of the state remains substantially as it was at the time Judge Bartol used the language above quoted; and it may be that individuals who constitute the public have lost sight of what the courts are bound to recognize, that the state, representing society as a whole, has a real and vital interest in maintaining the marital status, so that it may not be dissolved except for grave and weighty causes."

A careful study of all the evidence, as it now appears in this case, leads us to say that we are not satisfied, either, with the division of the property made

by the district court, as between the parties. The wife seems to have been given all the real estate accumulated by the joint efforts of her and her husband, as well as some personal property, all practically free and clear of encumbrance, while the husband has been assigned only various items of personalty, nearly all of which are subject to mortgage liens. He is heavily in debt. The obligations appear to have been incurred in good faith for the benefit of both parties. He has no money. There are no rights of children or extra burdens imposed upon the wife thereby to be considered. As the case must be retried, it would be improper for us to here indicate an absolute line of division which should guide the district court.

Naturally, we cannot say what a new trial may disclose. It may possibly be that the assignment of property as made to the parties by the decree aforesaid may ultimately be shown to be quite proper. Under the present record, as already suggested, we hardly think it is.

Our conclusion is, therefore, that the judgment must be reversed and a new trial ordered. It is with regret we feel obliged to take this action as it is perfectly plain that the parties can ill afford protracted litigation. Our view of the law and the facts in the case, however, permit no other course.

*Reversed.*

KIMBALL, C. J., and BLUME, J., concur.